FILED
OCT - 9 2007
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

# United States District Court

__EASTERN__ DISTRICT OF __VIRGINIA__

UNITED STATES OF AMERICA

V.

PANAGIOTIS SOTIROPOULOS
25-88 48TH Street, 1st Floor, Astoria, NY

**CRIMINAL COMPLAINT**

CASE NUMBER: 07mJ522

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

SEE ATTACHED SPECIFIC CHARGES

In violation of Title __18__ United States Code, Section(s) __371, 1956(h), 1341, 1343, 1344 and 2__.

I further state that I am a(n) __Special Agent with the Internal Revenue Service, Criminal Investigation Division__ and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof.  ✓ Yes  ☒ No

_[signature]_
**Signature of Complainant**

Sworn to before me, and subscribed in my presence

__10/9/07__                             at  Richmond, Virginia
**Date**                                     **City and State**   /s/
                                              M. Hannah Lauck
Honorable                                     United States Magistrate Judge
**Name and Title of Judicial Officer**        **Signature of Judicial Officer**

From on or about May 2, 2007, through at least October 1, 2007, in the Eastern District of Virginia, and elsewhere, and within the jurisdiction of this Court, defendants

    Sophia (Sofia) Moskofidis,
    Panagiotis Sotiropoulos, aka "Peter," and,
    Hussein Nasrallah, aka, Ali,

did unlawfully, knowingly and intentionally combine, conspire, confederate and agree together, with each other, and with other persons, both known and unknown, to commit the following offenses against the United States:

    1. To knowingly, willfully and unlawfully conspire, devise, and intend to devise a scheme and artifice to defraud various federally insured banking financial institutions, and obtain money and credits by means of false and fraudulent pretenses, statements and representations, and for the purpose of executing such a conspiracy, scheme and artifice to defraud and attempting to do so, in the Eastern District of Virginia and elsewhere, and within the jurisdiction of this Court, to knowingly, willfully and unlawfully place and cause to be placed in the Post Office and the authorized depository for mail an item, matter and thing to be sent and delivered by the United States Postal Service, according to the directions there on, to knowingly, willfully, and unlawfully take and receive, and cause to be taken and received, from the United States Mails an item, matter and thing, to knowingly, willfully and unlawfully send and deliver, and cause to be sent and delivered by mail according to the directions thereon, an item, matter and thing by the United States Postal Service, all in violation of Title 18, United States Code, §§ 1341, 1344, and 2;

    2. To knowingly, willfully and unlawfully conspire, devise, and intend to devise a scheme and artifice to defraud various federally insured banking financial institutions, and obtain money and credits by means of false and fraudulent pretenses, statements and representations,

and for the purpose of executing such a conspiracy, scheme and artifice to defraud and attempting to do so, in the Eastern District of Virginia and elsewhere and within the jurisdiction of this Court, to knowingly, willfully and unlawfully did transmit and cause to be transmitted in interstate commerce, by means of a wire communication, certain signs, signals, and sounds, that is, telephone calls and facsimile transmissions of materials, in and affecting interstate commerce, all in violation of Title 18, United States Code, §§ 1343, 1344 and 2;

3. To conduct and cause to be conducted a financial transaction which in fact involved the proceeds of a specified unlawful activity, being bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341), and wire fraud (18 U.S.C. § 1343), knowing that the property involved in the financial transaction represented the proceeds of the aforesaid unlawful activity, with the intent to promote the carrying on of the aforesaid specified unlawful activity, in violation of Title 18, United States Code, §§ 1956(a), and 2;

and further in fact did commit bank, mail and wire fraud, all in violation of Title 18, United States Code, §§ 371, 1341, 1343, 1344, 1956(h), and 2.

# AFFIDAVIT

I, Robin R. Rager, of the Internal Revenue Service, Criminal Investigation, being a duly sworn law enforcement officer, does hereby depose and say:

This affidavit is in support of the issuance of Arrest Warrants for Sophia (Sofia) Moskofidis, Panagiotis Sotiropoulos and Hussein Nasrallah, alleging violations of Title 18, United States Code, Section 371 and 1956(h) (Conspiracy), Section 1341 (Mail Fraud), Section 1343 (Wire Fraud) and Section 1344 (Bank Fraud).

## Affiant's Training, Experience, and Expertise

Your affiant, Robin R. Rager, is a Special Agent with the Internal Revenue Service, Criminal Investigation, and has served as such since December 1990. I am currently assigned to the Alexandria Field Office, Richmond Post of Duty, Richmond, Virginia.

As a Special Agent I have investigated or assisted in investigating several cases involving violations of the Internal Revenue laws (Title 26 USC), the Bank Secrecy Act (Title 31 USC), the Money Laundering Control Act (Title 18 USC), and related offenses. These investigations have involved the analysis and tracing of funds through the American Banking System, tracing and documenting asset acquisitions and expenditures, and assisting in computing individual taxable incomes using the specific item method of proof and indirect methods of proof, such as, net worth and cash expenditures computations.

Your affiant has received extensive training while employed with the Internal Revenue Service. Your affiant has attended several money laundering seminars, which focused on the methods used by individuals involved in illegal enterprises to secrete the proceeds of illegal activities, the use of financial, investment, and legal advisors, who assist these individuals in laundering their illegal proceeds; and the audit trails and other investigative leads that figure centrally in successful criminal investigations.

Any facts cited in this affidavit which were seen, heard, observed or concluded to by a law enforcement officer other than the affiant, have been told to this affiant by the officer who had personal knowledge thereof. All information attributed to other officers has been related to affiant, and affiant believes it to be totally true and correct. The purpose of this affidavit establishes probable cause only and may not reflect all information learned through this investigation.

## Background

Agents with the Bureau of Alcohol Tobacco Firearms and Explosives (BATFE), New York State Department of Taxation and Internal Revenue Service, Criminal Investigation Division have been involved in an ongoing undercover storefront operation located in King George, Virginia, within the Eastern District of Virginia. Through a confidential informant, Sophia Moskofidis was identified as running a fraud scheme whereby she assists foreign nationals living in the U.S. to fraudulently obtain credit cards and bank loans. These individuals then return to their "home" country, default on the loans and provide Sophia with a cut of the fraud proceeds. Sophia is effectively promoting and executing a "bust out scheme," in which she assists individuals in obtaining as much credit and loans as possible, taking out the cash, leaving the United States, and defaulting on the credit cards and loans.

## Summary of Undercover Activity to Date

### May 2, 2007

An IRS undercover agent (herein UCA) met with a Cooperating Witness (CW), Sophia (LNU), George (LNU), and Peter (LNU) at the storefront location in King George, VA. Sophia, George, Peter and another individual who later identified himself as Terry (LNU) arrived in a vehicle with a New York State license plate.

Sophia discussed obtaining credit cards and bank loans for the UCA (the UCA was posing as a foreign national living in the U.S. who is planning on returning to his home country of Lebanon). Sophia asked the UCA about his credit history and explained to the UCA that she could help him receive more than $150,000 in cash prior to his departure to Lebanon. In addition, Sophia advised the UCA that she would assist him in obtaining "store" credit cards. Sophia stated that the store credit cards would be obtained last and that the UCA could go on a shopping spree and max out the cards and then ship the goods back to Lebanon. Sophia stated "we do the cash first, and then we take care of the shopping."

During the course of the meeting the UCA advised Sophia that he was not working anymore. Sophia told him not to worry about it since he is self-employed. Sophia stated "that they don't care as long as I don't knock on the door of IRS, they don't care." Sophia requested that the UCA email her his credit report and the name of his employer. Sophia wrote her email address as "shadygrk007@yahoo.com" on a sheet of paper for the UCA. Sophia provided her telephone number as XXX-XXX-9094.

Upon departure, the King George County Sheriff's Department conducted a vehicle stop of their vehicle and identified the following individuals:

    Driver – T\_\_\_\_ A\_\_\_\_   DOB: X/X/58 SS# XXX-XX-5243

2

Passenger – Panagiotis Sotiropoulos  DOB: XX/XX/56 Resident Alien AXXXXXX
Passenger – Sophia Moskofidis  DOB: X/X/73  DL# XXX-8155
Passenger – N\_\_\_ G\_\_\_\_  DOB: X/XX/48 Permanent Resident A#XXXXX

The vehicle was registered to ELRAC, Inc., which is the parent company of Enterprises Rental Car, Inc., and was rented in the name of T_____ A_____.

A grand jury subpoena issued to Yahoo reflects the email address shadygrk007@yahoo.com is registered to Ms. Sofia Moskofidis located in Astoria, New York, 11103.

May 3, 2007

The UCA, located in California, sent an email to shadygrk007@yahoo.com providing information of his former employer. Later that evening Sophia responded, via email, that she enjoyed meeting him and that their next step "will be to start getting you some extra cash (hahaha)." The email notates "From" as Sophia Moskofidis, the same individual identified by King George County Sheriff's Department and with whom the UCA met with on May 2, 2007.

May 4, 2007

The UCA, located in California, received a call from telephone number XXX-XXX-9094. Sophia advised the UCA that he should expect a telephone call from American Express to confirm his address and identifiers. Sophia stated that he had been approved for $10,000 for an American Express credit card. Sophia also stated that his income stated $115,000, and not to tell American Express that he was currently unemployed. Sophia also stated that he should be receiving a credit card from Citibank and Bank of America. Once he receives the cards he should activate them and contact her. He should also contact her after he has received any telephone calls from the any of the three banks. Sophia asked the UCA when he would be returning to Virginia, to which he responded in a couple of weeks. Sophia stated that this would give him time to receive the cards and then the two of them could meet and talk about the next step. Sophia stated that there would not be a problem for the UCA to receive through credit cards and loans, over $200,000 prior to his leaving the country. The UCA also mentioned to Sophia that he knew someone who is leaving the country and may be interested in meeting her. Sophia stated to the UCA that he would receive a commission for referring someone.

May 5, 2007

An email from Sophia Moskofidis, shadygrk007@yahoo.com, was received by the UCA. Sophia said she felt that they are trusting each other from day one and that she felt she needed to tell the UCA certain things; specifically, about

3

George. Sophia asked the UCA to contact her on her private phone line XXX-XXX-0430.

A grand jury subpoena issued to Verizon for telephone number XXX-XXX-0430 shows the customer information as D___ K___ at XXXXXX, Astoria, NY 11103. The social security number stated for this individual on the customer information sheet was verified by the Social Security Administration that the number belongs to a "child." Further investigation revealed that the SS# was issued in 2004.

The Verizon Internet Service provider used for this email account also reflect the customer name as D___ K____ with the account address as XXXXXXX, Astoria, NY 11103.

May 6, 2007

The UCA, located in California, contacted Sophia at XXX-XXX-0430. Sophia stated that this was her home phone number and not to give the number to anyone. Sophia stated that she had some "indifferences" with George and that the UCA would be better off dealing with Sophia exclusively. Sophia stated that George told her that he had a contact at Chase bank about getting bogus loans but she has never met this individual.

May 15, 2007

The UCA, located in California, received an envelope in the mail from Bank of America, a federally insured financial institution, U.S. Airways Dividend Miles. The envelope contained two Bank of America U.S. Airways Dividend Miles Visa credit cards for the UCA with a credit limit of $15,000. The UCA also received in the mail an American Express Blue Cash credit card with a credit limit of $10,000 and a cash advance limit of $3,000. The UCA also received in the mail a letter from Citibank, a federally insured financial institution, requiring additional information.

The UCA, located in California, contacted Sophia at XXX-XXX-9094 and advised her that he had received the credit cards from Bank of America and American Express. He also advised her that Citibank required additional information. Sophia asked him to scan and email her the letter from Citibank along with a copy of a bank statement related to his former corporation. Sophia stated that she would take care of the problem. She also advised the UCA to begin using his credit cards and for now to pay them on time.

The UCA mentioned to Sophia that he could have done this on his own and asked if there was more than just acquiring credit cards. Sophia stated that there was more and that she needed to meet him face to face again.

May 21, 2007

The UCA, located in California, contacted a representative with Bank of America U.S. Airways Dividend Miles credit card. The representative stated that the account was completed online at the US Airways website. The application listed $115,000 in annual income and listed the employer as Petra Enterprises.

May 25, 2007

Sophia contacted the UCA via email and advised that she wanted to meet up with him and go over some details. She apologized for not getting back to him sooner stating that she was finishing up with another client.

May 31, 2007

The UCA, located in California, contacted Sophia at XXX-XXX-9094 and informed her that he was flying into Virginia and asked her to come down to meet with him. Sophia agreed and stated that she wanted to put everything on the table. Sophia also stated that she was going to hold off on the Citibank card because she did not like what they were asking for, but reassured the UCA she would still be able to obtain $200,000 for him.

June 7, 2007

A face to face meeting was arranged between the UCA and Sophia at the storefront location in King George, Virginia. Sophia arrived by herself driving a 2007 Toyota with NY License Plate ___9123. The vehicle is registered to S___ V___ at XXXXXX, Astoria, New York. A record check of S___ V___ reveals that she is employed with a large law firm in New York City.

Sophia expressed her concerns about G_____ and stated that G_____ does not know what he is doing. Sophia then stated that she planned for the UCA to rent an executive suite office space in New York, to put in the phone, fax and internet lines, and get things going to give the perception that the UCA's business has been in existence. She also stated that she and her boyfriend, Peter, began doing this couple of years ago. Peter used to have office space but now Sophia takes care of everything and maintains the records at her house located at the Astoria address to be searched. She began doing this because she did not want anyone else having access to their records.

Sofia further stated that once the office is set up and the business has been established, a business bank account will be opened for the UCA. The account will be funded by small loans obtained in amounts under $10,000. The goal is to build the checking account up to approximately $100,000. In addition to obtaining small loans, business and additional personal credit cards will be established. Prior to the UCA leaving the country an additional business loan will

5

be obtained. Once the funds are received, everything is cashed out. Her share of the total funds obtained is 50%. Therefore, if the UCA wants $250,000 to leave the country, she will obtain $500,000.

Sophia further explained to the UCA that she works with a woman who can "fix" or "clean up" the credit scores. Sophia pays her approximately $1,000 for her work. She also stated that she has someone who will notarize the documents, who works for a prominent law firm, and an individual who will assist in the preparation of any tax returns needed to obtain any of the loans. It was unclear if the individual who notarizes the documents was the same individual who can fix the credit score.

Prior to her leaving, the UCA asked Sophia if she needed assistance returning to New York since she had gotten lost on her way to Virginia. The UCA accessed his computer for Map quest. She provided an address of XXXXXXXX, Astoria, New York 11103 and stated "now you know where I live."

July 12, 2007

Sophia telephoned the UCA, located in California, and advised him that she talked to the Secretary of State and checked into the procedure on how to transfer his corporation from California to New York.

August 2, 2007

The UCA, located in California, contacted Sophia at XXX-XXX-2270 and informed her that he was able to obtain a certificate of good standing for his corporation. Sophia requested that he mail the document to her at her residence at XXXXXXX, Astoria, New York 11103. The UCA asked Sophia what was going to happen after he sent her the document to which Sophia advised him that she was in the process of looking at a couple of spaces and that they only need to set up a phone line and the regular necessities. She also stated that she wanted him to come to New York so they can sit down and organize all of the paperwork for the corporation. The corporation needed to be set up before they could obtain the loans. A copy of the certificate of good standing in the name of International Computers & Electronics was mailed to Sophia in New York by the UCA from a post office located in Arlington, Virginia, by the UCA.

August 10, 2007

Sophia telephoned the UCA, located in California, and advised him that she received the document in the mail. Sophia told him that she has sent her part of the paperwork in and was waiting for them to get back to her. Sophia also stated that everything is in place and that the next step would be to find a location for an office.

6

September 12, 2007

Sophia sent the UCA, located in California, an email and stated that she has started "full force" and that she was going to get him over $200,000. Sophia requested three months of statements for the corporation in addition to three to four credit references from the UCA. Sophia also advised him that the references could be friends vouching that they issued him credit in amounts over $35,000.

September 17, 2007

A face to face meeting was set up in New York between the UCA, Sophia and her boyfriend, Peter, who was identified as Panagiotis Sotiropoulis. The UCA picked the two of them up at their residence XXXXXXXXX, Astoria, NY, and was instructed by Sophia to drive to a coffee shop where they would meet a friend of theirs who Sophia stated was "part of the crew." Peter reconfirmed with the UCA that the UCA is not returning the United States and that the UCA will be living a good life.

Sophia explained in detail that they "have people" who can assist in transferring the money out of the country in amounts under $10,000. He could leave the country with $9,999 or wire the money in increments less than $10,000. Sophia also stated that she and Peter would personally wire money to an account for him in amounts under $10,000. Sophia gave an example where they advised a Turkish man, whom they assisted in obtaining funds, to send his money little by little to Greece. They found out that he did not follow their instructions and tried to leave the country with $65,000 - $70,000 in cash. This individual was at the airport, missed his flight and was detained and questioned. Authorities found the money strapped around his waste. She had told him to at least put the money in his pockets. Sophia advised the UCA that authorities will want to know where you got the money and whether you paid taxes on the same. As a result, this individual lost $10,000 of his money and left the country.

Another individual arrived at the coffee shop and introduced himself as Ali. This individual was later identified as Hussein Nasarallah. After small talk with the UCA, Ali advised the UCA that the first $40,000 made belongs to the UCA. Any monies earned after the initial $40,000 is split 50 – 50. The four of them then returned to Sophia's residence located at XXXXXXX, Astoria, NY, and entered the residence located on the 1st Floor. The UCA described to your affiant that their residence is the only one on the first floor of the building.

Ali advised the UCA that he would continue to maintain his business in California and they would open a "daughter" corporation under the same name in New York. Ali further stated that it doesn't matter if you have an office or warehouse in New York because they never check. Ali asked the UCA to obtain credit references from his friends stating that they have been dealing with the UCA's

7

company for some time and that they have loaned him $35,000 - $40,000 and have been repaid promptly.

Ali further stated that if there is a need for any financial statements, tax returns or any other documents, he would take care of it. The financial statements should reflect that the corporation makes $850,000 - $900,000 a year. Ali would submit these statements to a contact of his with Dunn & Bradstreet. If there are any inquiries of the corporation, Dunn & Bradstreet will give them positive feedback.

Sophia, Peter and Ali aka Hussein Nasarallah, explained, in detail, the following scenarios on how they would be obtaining the funds:

- Credit card terminals will be purchased for each corporation. Ali stated that they would maintain three of the machines in New York which they would be responsible for, and two of the machines in California to be used by the UCA. The credit card machines are to be used by family and friends and charges are made in amounts up to $2,000. The charges are then submitted to the credit card companies and the funds are re-deposited into the business checking. They would not be purchasing a product but just having a means of showing that the business is doing well. The UCA would be responsible for "eating the fees" in the beginning which is approximately 3 – 4 % of the charges. After three months of charges up to $100,000 in total, a private company would issue you a cash advance to assist in the payment of upcoming "fees" related to the charges. Ali would take care of any paperwork required by the companies. After the UCA receives his check, he would stop charging and walk away.

- Sophia and Peter both stated that they will open the bank accounts for the corporation and complete the paperwork to obtain loans and lines of credit. Once the loans or lines of credit are obtained, the UCA would make a few payments and stop. Ali stated that you only apply for loan amounts that don't exceed a certain amount. That way, the bank is not forced to ask you for tax returns. But if the documents are needed, Ali reiterated that he can take care of this and that he has people to help him.

- Sophia and Peter would also assist in obtaining the corporate credit cards. Corporate credit cards would be applied for and obtained using $975,000 as the corporation's income. This would enable them to receive over $100,000 in credit. Cash advances as well the purchase of products would be made on these credit cards. Peter further stated that they would be able to sell the products that have been purchased. Peter guaranteed $150,000 - $200,000 to the UCA.

- Sophia and Peter would also be assisting with obtaining personal credit cards. They would use these to obtain cash advances from the personal

8

credit cards. These cash advances would not be repaid. Ali stated that we can get you $80,000 - $90,000 in cash. Peter advised the UCA that Sophia would be obtaining 2 – 3 more cards for him during the week and have the same mailed to him at his address in California. The UCA asked if the cards are obtained on line to which Sophia responded, "Yes." The UCA also asked if this was done on the computer located in their residence at 25-88 48th Street, to which Sophia responded "Yes."

- Ali further stated that the last step is completed approximately 50 days before you leave the country. The corporation would apply for credit lines aka "house credit," at companies dealing in products such as electronics, computers, watches, clothing etc. This would include Dell, Gateway, Hewlett Packard, etc. The lines of credit would be for $100,000 - $300,000 or whatever could be obtained. The products are purchased and then resold. Ali reassured the UCA that he could re-sell the products. The lines of credit would not be repaid.

Once they have achieved their goals, Ali advised the UCA that he could leave the country or stay. If he decided to stay he could file personal bankruptcy or ignore the collection letters. If he decided to leave the country, he could return after five years because everything would be erased from the computers. Ali stated that he has been in this business for over 15 years and he knows exactly how to accomplish this because he has the experience and the connections.

Sophia and Peter again reiterated that the UCA will leave a happy man with over $300,000 and that the whole process will take approximately three months.

Again the movement of money was discussed. Ali stated that he has people who will help the UCA send the cash wherever and to whomever he wants. His "people" charge 12 % to wire the funds out of the country. Within 15 minutes the money would be available in your account, anywhere in the world.

If the UCA wanted to send the cash, Sophia, Peter and Ali again reiterated on keeping the amounts under $10,000. If the amounts are below $10,000 there would be no questions asked. Peter advised the UCA that he can make daily deposits of $9,000.

September 20, 2007

The UCA, located in California, sent an email to Sofia Moskofidis at shadygrk007@yahoo and stated

> "... I got a call from Bank of America small business loans yesterday. I wasn't sure what you applied for or what you told them, so I didn't answer any questions. Send me the information you sent them so I can call them back and tell them the same things you told them..."

9

Sofia Moskofidis at shadygrk007 responded:

"Hey I'm glad I got your email I was starting to get worried. Bank of America small business credit line up to $150k suppose to be linked to chk acct. info given 975,000 for business net, business from 2004, personal net 470,000. Call me after you speak to them or email me. Oh and you need the credit line if the ask for extention of company."

The UCA responded:

"...You know that I am no longer running International Computers and Electronics, is Bank of America going to ask me to prove any of the figures I am going to give them. I don't have anything that I can show them and if they look into it or try to visit the location they will see that there is no business and there is nothing there."

Sofia responded:

"listen don't worry because if they ask you added a partner, you are planning on opening and running international computers in ny. If they ask you for any papers let me know just get a fax number. Secondly with the credit line they will link it to the checking account you gave me that the statements for."

September 26, 2007

The UCA contacted Bank of America and confirmed that the application for the line of credit was an "internet application."

The UCA received by the United States Postal Service the following envelopes and their contents:

- An envelope addressed to International Computers & Electronics from Bank of America, GCIB Credit Services, Waltham, MA, which contained a letter thanking the UCA for his application for credit and requesting additional information, financial information and tax returns.
- An envelope containing a United Chase Visa Credit Card valid from 09/07 thru 09/10 with a credit line of $15,000.
- An envelope containing a Delta American Express Credit Card, valid thru 09/09 with a credit line of $6,300 and the cash advance limit of $1,300.

During their meeting in New York, Sophia confirmed to the UCA that she submitted the American Express Credit Card on her computer.

10

September 27, 2007

An agent with the New York State Department of Taxation observed a green in color Mercury Sedan bearing NY Registration ___4308 in front of the residence of XXXXXXX, Astoria, NY. The vehicle is owned and registered to Sophia Moskofidis at XXXXXXXX, Astoria, New York.

October 1, 2007

The UCA agent located in California received by United States Postal Service a People's Bank, a federally insured financial institution, Master Card with an expiration date of 07/10 and a credit limit of $2,500 and the cash advance limit of $625.

Thus, at this stage of the investigation, Sophia and conspirators Panagiotis Sotiropoulos, and Hussein Nasrallah, have obtained the following:

| Credit Card | Credit Limit | Cash Advance Limit |
|---|---|---|
| Bank of America U.S. Airways Dividend Miles | $15,000 | |
| American Express Blue Cash | $10,000 | $3,000 |
| United Chase Visa | $15,000 | |
| Delta American Express | $6,300 | $1,300 |
| People's Bank | $2,500 | $625 |

They have also laid out the scheme to defraud approximately $500,000 or more in fraudulent bank loans, lines of credit, and corporate and business credit cards.

## CONCLUSION

Therefore, based on my training and experience, as well as the foregoing facts and circumstances, it is believed that probable cause exists to issue arrest warrants charging Sophia Moskofidis, Panagiotis Sotiropoulos, and Hussein Nasrallah, with violations of Title 18 USC 371 and 1956(h) (Conspiracy), 18 USC 1341 (Mail Fraud), 18 USC 1343 (Wire Fraud) and 18 USC 1344 (Bank Fraud). It is respectfully requested that warrants be issued for their arrests.

Robin R. Rager, Special Agent
IRS-Criminal Investigation Division

Sworn and subscribed to before me this 9th day of October, 2007, at Richmond, Virginia.

/s/
M. Hannah Lauck
United States Magistrate Judge

11